IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLUE PRISM SOFTWARE, INC., | No: |
| Plaintiff, | |
| vs. | COMPLAINT |
| SUTHERLAND GLOBAL SERVICES INC., | |
| Defendant. | DEMAND FOR JURY TRIAL |

Plaintiff, Blue Prism Software, Inc. ("Plaintiff" or "Blue Prism"), by and through its attorneys, as and for its Complaint, alleges as follows:

## NATURE OF ACTION

1. Blue Prism is a software company that provides Robotic Process Automation software ("Robot(s)") that helps businesses automate manual, rules-based, back office administrative processes. When a customer purchases a license for the Robots, Blue Prism helps train the customer on how to program the Robots and the customer chooses which processes to program into the Robots.

2. On or around February 12, 2014, Blue Prism entered into a Software License and Support Agreement ("the Agreement")[1] with Defendant, Sutherland Global Services Inc. ("Defendant" or "SGS"), whereby SGS would purchase the license for 100 Robots from Blue Prism for an annual licensing fee of $7,800 per Robot, or a total of $780,000 per year for three years.

---

[1] Attached as Exhibit A is a true and correct copy of the Agreement.

- 1 -

3. Pursuant to the terms of the Agreement, SGS was required to pay $390,000 upon the delivery of the first tranche of 50 Robots and $390,000 upon the delivery of the second tranche of 50 Robots. In addition, SGS was required to pay Blue Prism licensing fees of $390,000 on the anniversaries of the two deliveries each year thereafter, for total payments of $2,340,000 over the initial period of three years.

4. While SGS paid $390,000 for delivery of the first tranche, it failed to remit the $390,000 payment for delivery of the second tranche, which was due on October 5, 2014, thereby breaching the terms of the Agreement with Blue Prism.

5. In accordance with the terms of the Agreement, the parties attempted but were unsuccessful in informally resolving the dispute, and Blue Prism now brings this action to recover the amounts owed, plus other relief to which it is entitled under the terms of the Agreement, as a result of SGS's contractual breach.

6. Through this action, Plaintiff seeks damages, including consequential and incidental damages, restitution and/or disgorgement of profits, pre- and post-judgment interest, attorneys' fees, costs, and all other relief that the Court deems proper.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and involves citizens of different states.

8. Venue is proper in this District because, pursuant to Section 13.4 of the Agreement, the parties agreed that "[a]ny dispute arising out of or relating to this Agreement shall be litigated in, and only in, courts located in New York, New York."

## PARTIES

9.     Plaintiff is the wholly-owned subsidiary of Blue Prism Ltd., a British corporation, and is a corporation incorporated under the laws of Delaware and it maintains its principal place of business in Miami Beach, Florida. Plaintiff is, therefore, a citizen of Delaware and Florida.

10.     Defendant is a corporation incorporated under the laws of New York and it maintains its office at 1160 Pittsford Victor Road in Pittsford, New York. Defendant is, therefore, a citizen of New York.

## FACTUAL ALLEGATIONS

### Blue Prism's Product and Services

11.     Blue Prism makes software Robots that perform simple manual, rules-based processes to automate back office administrative tasks that would otherwise be performed by humans. In particular, the Robots create a "virtual workforce" that enables businesses, with the support of information technology ("IT") specialists, to build, validate, and execute new business process automations across the business's existing applications and systems. For example, the Robots can be used to perform routine work, such as completing a benefits application, but that requires no human input or analysis.

12.     The Robots are a technology platform that is governed by IT and configured by the business to allow customization of the automated business processes to suit the needs and existing systems of the business. The Robots are trained to replicate the work of real human beings and are subject to the same system controls as human users would be to protect the transactional integrity and security of customer data.

13.     To create the automated processes, the Robots re-purpose the presentation layer of a business's existing enterprise applications as a service, which remains consistent across all

technologies. This allows the business to rapidly build and deploy Robots performing the process automations (thus replacing the need for a human to perform these tasks) without impacting the underlying technical infrastructure of the company. In essence, the business trains the Robots, in the same way that it would train a human being, to use the business's existing systems by programming the Robots to learn business rules, decision-making steps, extraction of data from input triggers, and other similar functions. The Robots then perform these automated tasks within the business's existing underlying technical, data security and database frameworks that are already in place prior to the process automation.

14. In addition to licensing the use of the Robots, Blue Prism also offers support services that include assisting its customers in training the Robots to perform certain processes and deploying the Robots, depending on the scope of Blue Prism's licensing agreement with its customers.

### The Agreement Between Blue Prism and SGS

15. On or around February 12, 2014, Blue Prism and SGS entered into the Agreement, attached as Exhibit A, for a three-year software license for SGS to use the Robots and for Blue Prism to provide support services related to the use of the Robots. Agreement, § 2.1. In exchange, SGS agreed to pay an annual licensing fee of $7,800 per Robot for 100 Robots for an initial period of three years. Agreement, Schedule 1, §§ 2, 6(a).

16. SGS ordered the Robots to be used in connection with automating the internal ordering system of Dell Inc. ("Dell"), for which SGS was hired to perform business process and technology management services. However, the license granted pursuant to the Agreement allowed SGS to use the Robots "at [SGS]'s discretion for any clients." Agreement, Schedule 1, § 5.

17.     Pursuant to the Agreement, SGS was to order the 100 Robots in two tranches of 50 Robots each, with the first tranche to be ordered no later than February 17, 2014 and the second tranche to be ordered no later than August 30, 2014. Agreement, Schedule 1, § 5.

18.     Immediately upon receipt of SGS's orders for each tranche of the 50 Robots (and on the anniversary dates of the delivery of each tranche), Blue Prism was to send an invoice to SGS and provide the license keys that give SGS access to the Robots. Agreement, Schedule 1, § 6(b). Blue Prism's invoices were to be paid by SGS within 30 days of receipt. Agreement, Schedule 1, § 6(c).

19.     The Agreement also provides that, if SGS had a *bona fide* dispute regarding any license fee set out in an invoice, SGS was to notify Blue Prism within ten business days of reasonably discovering the basis for the dispute and set out the reasons for such dispute. Agreement, § 5.4.

20.     If SGS failed to pay Blue Prism the sums to which it was entitled under the Agreement by the due date for payment, then Blue Prism would be entitled to (1) suspend any rights granted by Blue Prism to SGS to access and use the Robots until payment was made; and/or (2) charge interest on the amount in arrears, beginning from the due date for payment until payment is made, accruing on a daily basis and compounded monthly at the rate of 1.5% per month or the maximum annual rate permitted by law, whichever is less. Agreement, § 5.5.

21.     On or around February 19, 2014, SGS submitted its first purchase order, Purchase Order No. USPO1-0000009247 ("Purchase Order"),[2] for the first tranche of 50 Robots at $7,800 each, for a total licensing fee amount of $390,000 for the first 50 Robots for the first year. On the Purchase Order, SGS set out a section entitled "Terms and Conditions," which summarize the key terms of the Agreement and provide, in relevant part:

---

[2] Attached as Exhibit B is a true and correct copy of the Purchase Order submitted by SGS to Blue Prism.

- 5 -

> 3) This order is for the first tranche of 50 Licenses, against the total 100 licenses to be ordered
>
> 4) ***The PO for the second tranche of licenses to be released by August 2014.***

(Emphasis added.)

22. On or around February 20, 2014, Blue Prism sent SGS the product key to access the first 50 Robots, as well as an invoice for the Robots in the amount of $390,000, which SGS paid in a timely manner.

### SGS's Failure to Perform Under the Agreement

23. Shortly after delivery of the first 50 Robots, Dell changed its internal ordering system and SGS was not able to deploy the Robots in the same manner that it had originally intended and programmed the Robots to deploy.

24. Despite not deploying the Robots as originally intended, SGS had, and still has, access to all 100 of the Robots and can redeploy them in any way SGS sees fit.

25. Blue Prism has provided support services using reasonable skill and care and in good faith, and attempted to work with SGS prior to commencement of the contract term and throughout the contract period, to redeploy the Robots in a fashion that is compatible with Dell's new ordering system.

26. Subsequently, SGS failed to place the order for the second tranche of the remaining 50 Robots, which it was required to do by August 30, 2014, pursuant to the terms of the Agreement and the Terms and Conditions set out in the Purchase Order. *See* Agreement, Schedule 1, § 5; Purchase Order, § 4.

27. Because Blue Prism was obligated to deliver the second tranche upon the expected order date of August 30, 2014 pursuant to the Agreement and SGS's Purchase Order, and received no indication otherwise from SGS that it would not be placing an order for the

second tranche, Blue Prism delivered the second tranche of Robots on or around September 5, 2014, and sent the invoice, Invoice No. 5029,[3] to SGS for the license to the second tranche of 50 Robots in the amount of $390,000.

28.     Delivery for the second tranche of 50 Robots was accepted by SGS. *See* Agreement, § 3.2 (defining acceptance as the earlier of 30 days following installation or any live use of the software by SGS in a production environment).

29.     On or around October 23, 2014, Alastair Bathgate, Blue Prism's Chief Executive Officer, met with Janet Uhrich, SGS's Chief Delivery Officer, and Marwan Chouha, SGS's Senior Vice President of Business Transformation Services, during which time SGS indicated to Blue Prism, for the first time, that SGS was experiencing issues with the use of the Robots. Nevertheless, at this meeting, Ms. Uhrich strongly indicated that the outstanding balance on Invoice No. 5029 would be paid.

30.     When SGS failed to remit payment 30 days following delivery and acceptance of the Robots, and failed to notify Blue Prism of any dispute it had with the invoiced amount under Section 5.4 of the Agreement, Blue Prism made multiple requests to SGS via telephone, email, mail, and in person for immediate payment on its delinquent account.

31.     Upon information and belief, SGS never installed all the Robots it committed to or sought Blue Prism's assistance in redeploying and making the Robots work with the new Dell application systems, despite Blue Prism's offers and proposals to do so.

32.     Finally, in a letter dated December 18, 2014, SGS indicated, for the first time, that it was withholding payment due to its purported dissatisfaction with the performance of the Robots, alleging that "use of the Robots has not achieved a ratio of 1 Robot to 2.5 full-time

---

[3] Attached as Exhibit C is a copy of Invoice No. 5029 sent by Blue Prism to SGS on September 5, 2014, for the delivery of the second tranche of 50 Robots in the licensing fee amount of $390,000 per year for three years.

employees, something that was Blue Prism's minimum promised standard of performance under the Agreement...."

33. Blue Prism has never, as a matter of longstanding company practice and policy or under the terms of the Agreement, guaranteed any "minimum promised standard of performance" for its Robots. This is particularly true given the fact that SGS has full control over the performance of the Robots because it controls the actual deployment and choice of processes for the Robots.

34. Moreover, the only reference to the "1 Robot to 2.5 full-time employees" ratio in the Agreement is in Section 6(d) of Schedule 1, which provides:

> In accordance with discussions between Blue Prism and the Customer, Blue Prism will permit the Customer to take an additional 10 Robots at no additional cost to the Customer to improve the performance of the Dell Ordering Process System Application (the "Dell Application") if the Dell Application does not achieve a ratio of 1 Robot to 2.5 full time employees, provided that the Customer must have used all 100 Robots licensed hereunder for the Dell Application to receive such benefit. This offer of 10 Robots must be agreed to by both parties after reasonable review of the 100 Robots in use. The offer will expire 3 months after all 100 Robots have been activated and deployed in the Dell Application.

This section states only that Blue Prism would provide an additional ten Robots to SGS at no additional cost if the ratio is not achieved, and only if SGS used all 100 Robots licensed under the Agreement, which SGS failed to do.

35. Nothing in Section 6(d) of Schedule 1 of the Agreement, or in any other part of the Agreement, serves as the basis for any purported "minimum promised standard of performance" made by Blue Prism. Any warranties, conditions, terms, or obligations that are not expressly set out in the Agreement are specifically excluded. *See* Agreement, § 7.4. Moreover, any representations or promises made by the parties prior to executing the Agreement are

excluded, as are any variations or amendments to the Agreement unless made in writing and signed by both parties. *See* Agreement, §§ 14.8, 14.9.

36. Accordingly, SGS has not been excused from performing its obligations under the Agreement and owes Blue Prism $390,000 for the licensing fee (plus costs and interests) due upon the delivery of the second tranche of 50 Robots.

37. SGS's failure and continued refusal to remit the amount due and owing to Blue Prism constitutes breach of the Agreement.

38. Despite Blue Prism's efforts to convey the above to SGS and to provide technical assistance to help redeploy the Robots, on January 7, 2015, SGS sent Blue Prism a "Notice of Breach of the Agreement" ("Notice of Breach") pursuant to Section 11.4 of the Agreement, whereby SGS again restates Blue Prism's purported failure to achieve the ratio that constituted "Blue Prism's minimum promised standard of performance under the Agreement" and that such failure constituted a breach of the Agreement by Blue Prism.

39. Following receipt of the Notice of Breach, Blue Prism attempted to informally resolve the outstanding dispute with SGS, pursuant to the dispute resolution terms set out in Section 13 of the Agreement. Such attempts at informal dispute resolution have been unsuccessful.

40. Moreover, even after Blue Prism received the Notice of Breach, it continued to provide support and assistance to SGS to help make the best use of the Robots. Blue Prism even engaged in consultants, at its expense, to help SGS define its internal methodology, based on Blue Prism's intellectual property, to optimize use of the Robots. SGS still uses Blue Prism's proprietary methodology and practices (which Blue Prism typically provides as part of a software agreement), but has not paid for such use.

41. As a result of SGS's breach and unilateral termination of the Agreement, Blue Prism has incurred direct damages as follows: (a) $390,000 for the licensing fee (plus costs and interest) that was due upon the delivery of the second tranche of 50 Robots on Invoice No. 5029; (b) the remaining $1,560,000 in licensing fees that SGS was obligated to pay for use of the Robots for the remainder of the three-year term that the parties agreed to under the Agreement, plus costs and interest; (c) $316,000 (or 13.5% of the full Agreement value) for the commissions of the salesmen, management bonus, and other related services, in connection with the negotiation and execution of the Agreement; (d) $120,000 paid in salary to salesman and negotiation personnel working on the Agreement; (e) 15% of the values of Blue Prism's invoices to SGS in commissions paid to Blue Prism's partner, Virtual Operations; (f) customer support costs; and (g) travel costs to attend meetings with SGS, as well as to help SGS deploy the Robots more effectively. In addition, Blue Prism has suffered consequential and incidental damages.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

42. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

43. Blue Prism had a contractual relationship with SGS, the terms of which are set forth in the Agreement, attached as Exhibit A hereto.

44. Blue Prism fully performed its obligations under the Agreement, except when excused from performance due to SGS's own actions.

45. SGS breached its duties under the Agreement by, *inter alia*, failing to (i) order the second tranche of 50 Robots; (ii) pay Blue Prism $390,000 in annual licensing fees upon delivery of the second tranche of 50 Robots; and (iii) pay Blue Prism the remaining $1,560,000 in licensing fees for use of the Robots for the three-year term agreed to under the Agreement.

46. Blue Prism was damaged thereby in an amount to be proved at trial.

## SECOND CAUSE OF ACTION
### (Anticipatory Breach of Contract)

47. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

48. At all relevant times, Blue Prism performed its obligations under the Agreement and stood ready to perform its obligations thereunder.

49. SGS, by word and deed, communicated its absolute and unequivocal refusal to perform its obligations under the Agreement.

50. Blue Prism was damaged, thereby, in an amount to be proved at trial.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)

51. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

52. In the event that there is no enforceable contractual relationship between Plaintiff and Defendant, Plaintiff seeks to recover against Defendant for its unjust enrichment.

53. By engaging in the above-alleged acts and omissions, SGS has been unjustly enriched and benefitted, to the detriment of Blue Prism, by accepting delivery of the Robots and using Blue Prism's methodology and practices, and failing to pay Plaintiff the licensing fees of the Robots and for use of its methodology and practices.

54. SGS knowingly accepted and retained such benefits under such circumstances that it would be inequitable for SGS to retain such benefits without payment of value to Blue Prism.

55. SGS was unjustly enriched and is liable to account for and to pay Blue Prism such amounts to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Quantum Meruit)

56. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

57. In the event that there is no enforceable contractual relationship between Plaintiff and Defendant, Plaintiff is entitled to compensation for the licensing and delivery of the second tranche of 50 Robots to Defendant, as well as Defendant's use of Plaintiff's proprietary methodology and practices.

58. SGS understood and agreed that it would accept the 50 Robots from Blue Prism in return for compensation at commercially reasonable rates.

59. Notwithstanding the foregoing, SGS has failed and refused to compensate Blue Prism for the Robots and services, even though SGS benefitted from the Robots and services that Blue Prism provided to SGS.

60. Plaintiff has been injured by Defendant's conduct in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. An award of damages in an amount to be determined at trial;

B. Awarding pre-judgment and post-judgment interest at the maximum rate permitted by law;

C. Payment of reasonable attorneys' fees and costs; and

D. Such other relief as the Court may deem just and proper.

Dated:   June 9, 2015

/s/ Laurie Rubinow
Laurie Rubinow (LR6637)
Shepherd, Finkelman, Miller & Shah, LLP
875 Third Avenue, Suite 800
New York, NY 10022
Tel: (212) 419-0156
Fax: (866) 300-7367
Email: lrubinow@sfmslaw.com

Nathan Zipperian
Shepherd, Finkelman, Miller & Shah, LLP
1640 Town Center Circle, Suite 216
Weston, FL 33326
Tel: (954) 515-0123
Fax: (866) 300-7367
Email: nzipperian@sfmslaw.com

Valerie L. Chang
Shepherd, Finkelman, Miller & Shah, LLP
401 West A Street, Suite 2350
San Diego, CA 92101
Tel: (619) 235-2416
Fax: (866) 300-7367
Email: vchang@sfmslaw.com